644　　　　　　　　ROSTEIN v. HINES.

[No. 16203.　Department Two.　May 19, 1921.]

## J. ROSTEIN, *Respondent*, v. WALKER D. HINES, *Defendant*, VICTOR LAMKEN, *Intervener and Appellant*.[1]

ESTOPPEL (38)—GROUNDS—CLOTHING ANOTHER WITH APPARENT TITLE—APPROVAL AND PARTICIPATION IN SALE OF PERSONAL PROPERTY. Where an oral contract for the sale of a quantity of scrap rails was made between two parties, the seller is estopped to deny that title did not pass because of failure to pay the purchase price, where both parties subsequently participate in making sale to a third party which had been initiated by the original purchaser under the unconsummated contract.

SALES (36)—CONSTRUCTION OF CONTRACT—TRADE ACCEPTANCES—TERM OF CREDIT. Where a quantity of scrap rails was sold under an agreement to take the trade acceptances of the purchaser payable in thirty and sixty days, the sellers could not later rescind on the ground that such trade acceptances were not bankable paper.

SALES (148)—REMEDIES OF BUYER—RECOVERY OF PRICE OR GOODS—MARKET VALUE—EVIDENCE—SUFFICIENCY. In an action for damages based on the value of rails sold but not delivered to plaintiff, evidence held on appeal to fix the value at forty dollars per ton instead of at sixty-five dollars as found by the trial court.

SALES (144)—REMEDIES OF BUYER—ACTION FOR PRICE. Where a contract for the sale of rails provided for payment by trade acceptances, the buyer is not entitled to a judgment for the price in cash, but to an alternative judgment for return of the rails or their value.

APPEAL (433)—REVIEW—HARMLESS ERROR—FAVORABLE TO PARTY COMPLAINING. Error cannot be predicated upon extending to appellant the time for making delivery of rails sold, since it was favorable to him.

Appeal from a judgment of the superior court for King county, Smith, J., entered July 2, 1920, upon findings in favor of the plaintiff, in an action on contract, tried to the court. Modified.

*H. R. Lea,* for appellant.

*Reynolds, Ballinger & Hutson,* for respondent.

PARKER, C. J.—By this action, as originally commenced in the superior court for King county, the plain-

[1] Reported in 198 Pac. 385.

tiff, Rostein, sought recovery from the United States director general of railroads, in charge of the lines of the Chicago, Milwaukee & St. Paul Railway Company, of five car-loads of used railroad rails, which rails had been sold as scrap rails by the duly authorized representative of the director general to Victor Lamken, who in turn, as it is claimed, had sold the rails to his brother, Arthur Lamken, who in turn had sold the rails to the plaintiff; the rails not having been delivered by the director general to Victor Lamken, though paid for by him, but being held by the director general subject to the directions of Victor Lamken as to delivery under his purchase contract. The director general, having been paid for the rails by Victor Lamken and considering the title thereto as having passed as between him and Victor Lamken, filed his answer to the plaintiff's complaint accordingly, praying, in substance, that Victor Lamken be required to intervene as a party defendant in the action and that he, the director general, be absolved from all liability with reference to the rails, other than that of a mere stakeholder as between the plaintiff and Victor Lamken. Pursuant to an order of the court made in that behalf, Victor Lamken filed his answer and complaint in intervention, claiming to be the owner of the rails. Thus the controversy became one between the plaintiff and Victor Lamken as to the ownership and right of possession; though the rails remained in the possession of the director general, as custodian of the lines of the Chicago, Milwaukee & St. Paul Railway Company, subject to the order or final judgment of the court in this action. A trial before the court, sitting without a jury, resulted in findings and judgment awarding recovery of the rails to the plaintiff, Rostein, as against the defendant director general and the intervening defendant, Victor Lamken; and,

also, recovery of damages as against the intervening defendant, Victor Lamken, for the detention and withholding of possession of the rails from the plaintiff. From this disposition of the case by the superior court, the intervening defendant, Victor Lamken, has appealed to this court.

When we hereinafter refer to the railway company or its employees, we shall mean the Chicago, Milwaukee & St. Paul Railway Company and its lines, as in the custody of the director general, and the employees of that company as acting for and by authority of the director general. In November, 1918, the employees of the railway company had collected at Tacoma five carloads of railroad rails, which were inspected and classified by them as scrap rails unsuited for further use on its lines. They offered these rails for sale at thirty-four dollars per ton, the trial court finding that to be "the then market price and the price fixed and determined by law and the regulations of the United States government for the sale of such rails."

A few days prior to November 21, 1918, appellant Victor Lamken entered into an oral contract with the railway employees for the purchase of these five carloads of rails at thirty-four dollars per ton, the contract calling for the delivery of the rails to the order of appellant, at either Tacoma or Seattle, as he might elect, without further charge and at the risk of the railway company until such delivery should be made. Appellant promptly paid the contract price as agreed. On November 21, 1918, appellant directed the railway employees to ship the rails to Seattle and notify him upon their arrival there. On November 23, 1918, the rails not having then left Tacoma, appellant countermanded his directions to ship them to Seattle and directed the railway employees to hold the rails in Tacoma subject

to his further directions. This the railway employees intended doing, but by mistake three of the cars were thereafter sent to Seattle. On November 21, 1921, appellant entered into an oral contract with his brother, Arthur Lamken, doing business as the Milwaukee Junk Company, to sell the rails to him at an agreed price of thirty-seven dollars a ton, cash on delivery. Appellant was never paid the purchase price so agreed upon, and because of that fact refused to deliver, or permit the railway employees to deliver, the rails to Arthur Lamken or respondent Rostein. On November 21, 1918, the same day on which Arthur Lamken had entered into the contract with appellant, his brother, for the purchase of the rails, he entered into a contract for the sale of the rails to respondent Rostein at the agreed price of forty dollars per ton. This contract is evidenced by a writing then executed as follows:

J. Rostein                              Tacoma, Wash., Nov. 21, 1918.
   Seattle, Wash.

To MILWAUKEE JUNK CO., Dr.
Dealer in
ALL KINDS OF JUNK
Buyers of Metal, Rubber, Manilla Rope, Sacks, Scrap Iron
Machinery, Pipe, Etc.
315 Puyallup Ave.

Sold to J. Rostein 5 Carloads of Rails as follows:

| C. M. & S. P. | No. 62553  |                  | 83800 lbs. |
| O. W.         | No. 50240  | cars to be billed | 75700 lbs. |
| P. L.         | No. 925007 | for Seattle      | 63500 lbs. |
| P. L.         | No. 822339 | the same date    | .76400 lbs. |
| P. L.         | No. 938759 |                  | 68600 lbs. |

Total                           367600 lbs.

367600 lbs. F. O. B. Seattle at $40 per gross ton.......... $6,564.28
Payment in full received from J. Rostein with Alaska Junk Co.'s trade acceptances for 30 days & 60 days. Rails examined and accepted O. K. by Mr. J. Rostein for the Alaska Junk Co.

Milwaukee Junk Co.
A. Lamken

Accepted for Alaska Junk Co.
   J. Rostein.

While the language of this contract is somewhat involved, it nevertheless seems plainly sufficient upon its face to transfer the title to the rails from Arthur Lemken, doing business as the Milwaukee Junk Company, to respondent Rostein; that is, sufficient to so transfer whatever title Arthur Lamken then had in the rails. Touching the question of respondent's thus acquiring title to the rails as against appellant, the trial court found as follows:

"That at said time the said A. Lamken, as the Milwaukee Junk Company, did not own said rails or have the same in his possession and never obtained title to them, but his brother, the intervener, was fully cognizant of the negotiations between the Milwaukee Junk Company and J. Rostein, had participated in them and approved of the sale of said rails to plaintiff.

"That at the time of making said contract the plaintiff represented to the said Milwaukee Junk Company that he had power to examine, inspect and accept the said rails in behalf of the Alaska Junk Company, a corporation of Seattle, Washington, whose trade acceptances were to be given for the amount specified in payment for the said rails. That both intervener and said A. Lamken had been to the Seattle office of the Alaska Junk Company and offered and agreed to take Alaska Junk Company trade acceptances in payment of the purchase-price of said rails. That thereafter, and before concluding the sale, said Lamken brothers and plaintiff met in Tacoma and intervener's bookkeeper prepared the contract of sale which was executed by said A. Lamken and plaintiff, said A. Lamken having first consulted his banker and satisfying himself of the value of said trade acceptances.

"That in conformity with said agreement the trade acceptances mentioned in said agreement were delivered to the said Milwaukee Junk Company and the said Milwaukee Junk Company thereupon sought to negotiate the same and to obtain cash to make payment for the said rails, and the said Milwaukee Junk Company not being able to make payment to intervener for the

said rails, the intervener thereupon ordered the employees of the said railway company to hold the said shipment as aforesaid subject to his order. That said Lamken brothers made investigations to find the status of said trade acceptances and the legality of their issuance. It was disclosed that the transaction on part of the Alaska Junk Company was not an accommodation to plaintiff, but a deal on a basis of even division of profits with plaintiff; that similar trade acceptances had on different occasions been received from the Alaska Junk Company by said Lamkens; that by reason of internal dissensions in the Alaska Junk Company the credit of the company had been impaired in the opinion of certain Tacoma banks, and its paper was not there bankable, but said company was fully solvent and the banks of Seattle continued to accept the commercial paper of said company; that said A. Lamken, as the Milwaukee Junk Company, with knowledge and approval of intervener, informed plaintiff that he would not deliver said rails except upon payment of cash therefor, to the amount of said trade acceptances, less bank discount. That the Milwaukee Junk Company, with the knowledge and approval of intervener, has ever since November 21, 1918, been ready, able and willing to deliver said rails upon payment to said company of the amount stipulated, if payable in cash; and has also been ready, able, but unwilling, to deliver the same upon the basis of the trade acceptances, as agreed in the contract of November 21, 1918, and the plaintiff has known and been informed of such fact at all times.

"That on the 26th day of November, 1918, the Milwaukee Junk Company, at the time it refused to make delivery of the rails above mentioned, returned to the plaintiff the trade acceptances mentioned in the contract aforesaid, and upon the plaintiff returning them to it a few days later, again returned them to the plaintiff with the definite refusal to again receive them, and plaintiff has had possession of the said trade acceptances at all times since. That at no time have the said trade acceptances been paid nor has any tender of payment been made either by the plaintiff or the Alaska

Junk Company, and neither the intervener nor the Milwaukee Junk Company have been paid the price or any part of the price of said rails.''

At the time of the commencement of this action, which was on December 6, 1918, three of the cars of rails were in Seattle, having remained there still loaded upon the cars, since their shipment by mistake as above noticed. This seems to account for the bringing of the action in the superior court for King county. Indeed, respondent Rostein, in bringing the action, seems to have proceeded upon the assumption that all of the rails were then in Seattle, where he made demand upon the railway employees for possession of the rails, upon the refusal of which he commenced this action. There never was any seizure of the rails, by writ of replevin or otherwise, in this action; and they have at all times remained in the hands of the railway company, the three cars which were shipped to Seattle by mistake having been returned to Tacoma and all five of the cars there unloaded and the rails retained by the railway company in a separate pile for future disposition such as may be ordered by the court in this action. The trial court found:

''That at all times from said November 21, 1918, until the commencement of this suit, said rails were partly suitable relaying rails and of the reasonable market value, f. o. b. cars at Seattle, of sixty-five dollars ($65) per ton, and said rails were of the total market value of ten thousand six hundred sixty-seven and 50/100 dollars ($10,667.50).''

The court rendered its alternative money judgment against both the defendant director general and appellant Victor Lamken, and judgment against appellant for damages for withholding possession of the rails from respondent, accordingly.

One of the principal questions here presented to us, as we understand this controversy, is, not whether title to the rails passed from appellant to his brother Arthur Lamken, as counsel for appellant seems to argue; but whether title to the rails passed from Arthur Lamken to respondent under such circumstances, with appellant's participation therein and approval thereof, that appellant is now estopped from asserting that Arthur Lamken did not have power to convey title to the rails, as he in form did by the contract of sale made by him as the Milwaukee Junk Company with the respondent.

This, in its last analysis, presents little else than questions of fact. A careful reading of the record leads us to conclude that we cannot say that the trial court's findings touching that subject are not supported by the preponderance of the evidence. We conclude, therefore, that appellant, because of his participation in and approval of the sale of the rails made by Arthur Lamken to the respondent, must now abide by that contract and sale as if made by appellant himself. It thus becomes of no consequence in our present inquiry whether title to the rails ever passed from appellant to his brother Arthur Lamken as between themselves, because of failure of the payment of the purchase price under their oral sale contract.

Contention is made in appellant's behalf that, in any event, the sale of the rails to respondent was rescinded. We assume this contention means that the sale was rescinded by Arthur Lamken, since he was the one who made the sale contract, in form, with respondent. However, as we have seen by the findings above quoted, both appellant and his brother Arthur Lamken equally participated in the consummation of the sale of the rails to respondent, including the agreement to re-

ceive, and the receiving of, full payment for the rails in trade acceptances of the Alaska Junk Company. It was after the sale to respondent was so consummated that the Lamkens conceived the idea of avoiding it. This claim of the Lamkens was rested upon what they conceived to be the want of financial responsibility of the Alaska Junk Company and their inability to dis-count trade acceptances of that company at a bank, and so realize cash thereon. The trouble with this contention is, as it seems to us, that we are unable to conclude from the evidence—as the trial court also seemed unable to do—that there was ever any agree-ment that the trade acceptances of the Alaska Junk Company to be given in payment for the rails should be bankable acceptances. The mere fact that such ac-ceptances could not, after their issuance, be discount-ed and cash realized upon them at a bank, does not argue that the Alaska Junk Company is not bound to honor them when due and presented to that company for payment; and we see nothing in this record which to our minds seriously argues that these acceptances are not legal trade acceptances in so far as the liability of the Alaska Junk Company thereon is concerned. It seems to us that the sale of the rails from the Lamkens to respondent was, in any event, a sale upon credit, in-sofar as the ultimate realizing of payment of the pur-chase price in cash is concerned; and hence the title to the rails passed to respondent, as against both of the Lamkens, upon the execution of the sale contract by Arthur Lamken, above quoted, and the acknowledg-ment therein of payment of the purchase price by the receipt of the trade acceptances of the Alaska Junk Company. This was not a sale of goods the purchase price of which was agreed to be paid in cash at the time of making the sale and a check, immediately payable

upon presentation, given therefor by the purchaser upon a bank in which he had no funds to meet it, the seller being led to believe that the check would be immediately honored, as in *Quality Shingle Co. v. Old Oregon L. & S. Co.,* 110 Wash. 60, 187 Pac. 705, and *Getchell v. Northern Pac. R. Co.,* 110 Wash. 66, 187 Pac. 707, relied upon by counsel for appellant; but it was a sale the purchase price of which was to be paid and was paid by these trade acceptances, as evidencing an obligation of the Alaska Junk Company falling due thirty and sixty days after the consummation of the sale. Indeed, it is evident, from the record before us, that all parties contemplated the rails would be again sold by respondent, the purchaser, long before the acceptances would be due. These considerations, we think, lead to the conclusion that respondent was entitled to recover the rails, or, in the alternative, their value.

Other contentions made in appellant's behalf render it necessary to now notice the form of the judgment as originally entered and thereafter modified by the trial court. The judgment, as originally entered, following the usual formal recitals, reads:

"It is therefore hereby Considered, Ordered and Adjudged by the court as follows:

"(1) That plaintiff is the owner of the property described in the Findings of Fact herein, towit: 367,600 pounds of steel rails.

"(2) That defendant and the intervener herein forthwith, towit: within ten (10) days from the date of the entry of this judgment, deliver said property to plaintiff f. o. b. cars at Seattle, Washington.

"(3) That in case such delivery cannot be had that plaintiff recover of and from defendant and said intervener, and each of them, the value of said property as of the date of the commencement of this suit, towit:

the sum of ten thousand six hundred sixty-seven and 50/100 dollars ($10,667.50).

"(4) In case said property be forthwith delivered as hereinabove provided, towit: within ten (10) days after the date of the entry of this judgment, that plaintiff have and recover of and from intervener the damage by him sustained through the detention of said property from him, in a sum equal to the difference between the value of said property at the date of the commencement of this suit, towit: the sum of ten thousand six hundred sixty-seven and 50/100 dollars ($10,-667.50), and the market value of said property at the time of such delivery, which may be ascertained as follows: at any time within thirty days after the delivery of said property, if the same be delivered to plaintiff, plaintiff may sell said property at the highest market price which he may be able to obtain in Seattle, Washington, and thereafter may apply to this court for a judgment ascertaining and fixing the amount of his said damage and the court hereby retains jurisdiction of this cause for the purpose of ascertaining and adjudicating the amount of said damage."

Thereafter, upon the hearing of and in denying appellant's motion for a new trial, the original judgment was modified in a supplemental judgment reading in part as follows:

"(1) That paragraph two of the original judgment herein entered be, and the same hereby is, modified by prescribing the delivery of the property therein referred to to plaintiff within thirty days from this date rather than within ten days from the date of entry of said judgment as in said paragraph provided.

"(2) That paragraph four of the original judgment herein entered be, and the same hereby is, modified by prescribing the delivery of the property therein referred to to plaintiff within thirty days from this date rather than within ten days from the date of entry of said judgment as in said paragraph provided.

"(3) It is further hereby adjudged and decreed by the court, by way of supplemental judgment, that at

the time the steel rails mentioned in the original judgment entered herein are delivered to plaintiff, that plaintiff shall deliver to Arthur Lamken trade acceptances of Alaska Junk Company, of Seattle, Washington, of the form and in the amounts of the trade acceptances referred to in the Findings of Fact herein and now on file in this court, except in this: that said trade acceptances shall be dated the day of the delivery of said rails and shall be payable, the one for $3000 thirty days thereafter and the one for $3567.85 being made payable sixty days thereafter."

It is contended in appellant's behalf that the original and supplemental judgments are both erroneous in form, in that the judgment should have been, "that the defendants deliver the goods to the plaintiff upon the payment by the plaintiff to the intervener and the Milwaukee Junk Company of the purchase price agreed to be paid;" the contention evidently meaning the payment of the purchase price in cash. What we have already said in pointing out that the sale contract was not a sale for cash, we think is a sufficient answer to this contention. The passing of title did not depend on payment of the purchase price in cash.

It is contended in appellant's behalf that the trial court erred in adjudging the market value of the rails between November 21, 1918, the date of the sale, and December 6, 1918, the date of the commencement of this action, to be sixty-five dollars per ton and of the total value of $10,667.50, and in the making of that the amount of respondent's alternative money judgment, in case the rails should not be delivered to him; and, also, in the making of the difference between that sum and the market value to be determined as directed, the amount of the damage judgment to be rendered against appellant for the withholding of the possession of the rails in case they were ultimately delivered to respondent. These contentions present questions of

fact as to which we feel constrained to disagree with the conclusion reached by the trial judge. It may be conceded that the evidence shows the market value of relay rails, as distinguished from scrap rails, to have been sixty-five dollars per ton between November 21 and December 6, 1918; and that had these rails been relay rails their total market value would then have been $10,667.50, as concluded by the trial court. A critical reading of the findings above quoted suggests that the trial judge regarded only a part of the rails as relay rails. Just what the quantity was he so regarded, is not made plain; yet he concludes that they were all worth sixty-five dollars per ton. The evidence, as we read it, plainly preponderates in support of the view that the rails were not relay rails and were worth in no event more than forty dollars per ton, the price at which respondent purchased them, between November 21 and December 6, 1918. Respondent testified that the rails were worth sixty to seventy-five dollars per ton, and was of the opinion that they are relay and not scrap rails. Burke, the construction foreman of the port commission of Seattle, expressed the opinion in his testimony that, as to two cars of them which he had examined, they were worth sixty dollars per ton. As to other cars, he was somewhat uncertain, but said: "I guess the port would be willing to pay thirty-five or forty dollars for them to get them." Dulien, secretary and manager of the Alaska Junk Company, testified that relay rails were worth sixty-five dollars per ton in the market, but seems not to express any opinion as to whether these were scrap or relay rails. This is the whole of the substance of the evidence as to the value and character of the rails, relied upon by counsel for respondent. Kroha, one of the railway employees, being storekeeper, having authority to sell

these rails, testified that they were all scrap rails.
Webb, one of the railway employees, being roadmaster
and acquainted with these rails, testified in substance
that they were all scrap rails. Hasburg, one of the
railway employees, being rail inspector, testified in
substance that these were all scrap rails. There is
other evidence in the record showing that these rails
were, by the railway employees authorized so to do,
regularly inspected and classified as scrap rails, re-
sulting in the regular authorization of their sale. We
cannot escape the conclusion that the trial court was
in error in finding that the rails in question were, be-
tween November 21 and December 6, 1918, of a greater
market value than forty dollars per ton, the price at
which they were sold to respondent by appellant and
his brother Arthur Lamken. Were it not for this pur-
chase of the rails by respondent at forty dollars per
ton, we could hardly escape the conclusion that they
were, during that period, worth not more than thirty-
four dollars per ton at which the employees of the rail-
way company sold them to appellant. We conclude
that the judgment, and the modification thereof by sup-
plemental judgment, are erroneous in so far as they fix
the market value of the rails during that period at a
greater sum than forty dollars per ton, or the total
sum of $6,564.28; and that the judgments must be
modified accordingly.

It is contended in appellant's behalf that the trial
court erred in entering its supplemental judgment.
Paragraphs 1 and 2 of the supplemental judgment, ex-
tending the time of delivery, could hardly be claimed
to be prejudicial to the rights of appellant, since such
extension of time was more favorable to him than to
respondent. As to paragraph 3 of the supplemental
judgment, relating to the furnishing and delivering to

appellant of new trade acceptances of the Alaska Junk Company upon delivery of the rails, we think the judgment should be modified so that, in lieu of such trade acceptances, should respondent fail to furnish them as directed, he shall pay to appellant the agreed purchase price in cash upon delivery of the rails, less an amount equal to the usual bank discount upon such trade acceptances. This is probably the legal affect of paragraph 3 of the supplemental judgment, but we make this observation to the end that it may be made certain in this respect. Whatever other errors may have been committed by the trial court, we feel quite satisfied they did not work to the prejudice of appellant.

We conclude that the judgment and supplemental judgment should be reversed, in so far as they adjudge the value of the rails during the period from November 21 to December 6, 1918, to be sixty-five dollars per ton and of the total value of $10,667.50; and that the value of the rails during that period should be adjudged to be forty dollars per ton and of the total value of $6,564.28, the price at which respondent purchased them; and that the amount of respondent's alternative money judgment, and his judgment for damages, should be limited and measured accordingly. We also conclude that the thirty days following the entry of the supplemental judgment for the return of the rails to respondent should again be extended to thirty days following the going down of the remittitur from this court to the superior court. The cause is remanded to the superior court for further proceedings consistent with the views herein expressed.

Appellant will recover his costs incurred in prosecuting his appeal in this court.

MOUNT, TOLMAN, MITCHELL, and MAIN, JJ., concur.